AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
JUL 26 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. **19MJ3132**
)
Apple iPhone Xs, Model: MT9K2LZ/A )
Serial Number: C38X98H6KPG6 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960 | Importation of Controlled Substances |

The application is based on these facts:
See Affidavit of Special Agent Lauritz Austensen.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HSI Special Agent Lauritz Austensen
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/24/2019 @ 11:30 a.m.

_____
*Judge's signature*

City and state: San Diego, California          Hon. Peter C. Lewis, US Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Lauritz Austensen, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following:

    An Apple iPhone Xs cellular phone
    Model: MT9K2LZ/A
    Serial Number: C38X98H6KPG6
    IMEI: 35 721409 046887 3
    (**"Target Device"**)

    as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Juan Andres PADILLA Felix (hereafter referred to as "PADILLA") for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Device** was seized on April 9, 2019 at the Otay Mesa Port of Entry in San Diego, CA. The **Target Device** was seized from PADILLA pursuant to his arrest for importation of federally controlled substances. The **Target Device** is currently stored as evidence in the Homeland Security Investigations (HSI) evidence vault located at 2255 Niels Bohr Court, San Diego, CA 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I have been a sworn federal agent for 13 years, authorized to investigate violations of United States laws, and to execute warrants issued under the authority of the United States. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the San Ysidro office under the Special Agent in Charge in the San Diego office. I have been employed by HSI since 2016. As part of my daily duties as an HSI agent, I investigate criminal violations relating to narcotics smuggling. I have received training from the Federal Law Enforcement Training Center and other law enforcement agencies in the area of narcotics smuggling. I have participated in dozens of narcotics smuggling investigations. I am in routine contact with experts in the field of narcotics. Prior to my employment as a Special Agent with HSI, I was employed as a Deputy United States Marshal/Criminal Investigator with the United States Marshals Service (USMS) in the Southern District of California. Prior to my employment with USMS, I was employed as a Special Agent with the United States Diplomatic Security Service. In preparation for this affidavit, I have discussed the facts of this case with other law enforcement agents/officers within HSI and other agencies.

7. Based on my experience and training, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become

knowledgeable of the methods and modes of narcotics operations and the language and patterns of narcotics abuse and trafficking. I have become familiar with the methods of operation typically used by narcotics traffickers.

8. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine, heroin, and methamphetamine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones

9. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

3

     e.     Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

     f.     Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

     g.     The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

10. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

a. tending to identify attempts to import methamphetamine, cocaine, or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, cocaine, or some other federally controlled substance from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, cocaine, or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

12. According to a report prepared by Customs and Border Protection Office (CBPO) Tan, on April 9, 2019, at approximately 4:40 PM, PADILLA was contacted during pre-primary inspection. He was the driver, sole occupant, and registered owner of a 2011 Silver Cadillac CTS. PADILLA presented his border crossing card and gave a negative customs declaration. CBPO Tan noticed a non-factory compartment in the vehicle's bumper. CBPO Tan used his B10 Buster on the bumper and it registered a high density. He requested that Canine Enforcement Officer (CEO) Drivdahl screen the vehicle with his narcotics and human detector dog (NHDD).

13. CEO Drivdahl reported that his NHDD, Dio, alerted and indicated by lying under the vehicle's rear bumper. CEO Drivdahl informed CBPO Tan of this indication,

and CBPO Tan referred the vehicle to secondary inspection. According to CBPO Tan's report, he then escorted PADILLA to the security office.

14. According to a report written by CBPO Harris, the vehicle was driven through the Z-Portal and anomalies were identified in the rear bumper. CBPO Harris examined the bumper and observed packages inside. He removed 41 plastic wrapped packages from a non-factory compartment in the rear bumper. Those packages were field-tested and were found to contain 18.36 kilograms of a substance that tested positive for methamphetamine and 4.46 kilograms of a substance that tested positive for cocaine. CBPO Harris also located a tracking device in the center console of the vehicle.

15. Your affiant responded to the Otay Mesa Port of Entry and conducted an interview of PADILLA. PADILLA was read his *Miranda* rights. He agreed to waive those rights and speak to agents.

16. PADILLA admitted to knowledge of the narcotics, and stated that he had been instructed to take the narcotics to Plaza Bonita, near the Port of Entry, and await further delivery instructions.

17. PADILLA further stated that he had previously been stopped in November 2018 by United States Border Patrol (USBP) Agents, and the vehicle that he and his cousin, Juan Carlos FELIX MONZON (hereafter referred to as "FELIX"), were driving was seized by USBP. PADILLA stated that he was working off the value of that vehicle by smuggling the narcotics.

18. A USBP report written by Border Patrol Agent (BPA) Olvera confirms that on November 2, 2018, PADILLA and FELIX were stopped by USBP traveling southbound on Interstate 5 near San Clemente, California, in a Honda CRV. During an interview following the stop, PADILLA admitted that he had picked up the car in the United States earlier that day, and driven it to a house in Santa Ana, where he personally pulled thirteen to fifteen packages of narcotics out of a non-factory compartment in the vehicle. BPA Olvera further reported that a search of the vehicle revealed an empty non-factory

compartment in the vehicle's gas tank. PADILLA and FELIX were released and the vehicle was seized by USBP.

19. The **Target Device** was discovered and seized from PADILLA's person by CBPO Harris at the time of PADILLA's arrest on April 9, 2019. HSI assumed custody of the **Target Device** on April 10, 2019.

20. I conducted a review of TECS records for PADILLA, the vehicle he was arrested in on April 9, 2019 (Cadillac CTS), and the vehicle he was detained with in November 2018 (Honda CRV). From the review, it appears that PADILLA crossed from Mexico into the United States in the Cadillac CTS six times, beginning November 1, 2018. It also appears that PADILLA crossed from Mexico into the United States in the Honda CRV on a handful of occasions, as early as October 1, 2018.

21. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that PADILLA likely used the **Target Device** to coordinate the importation of federally controlled substances into the United States. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Device** that may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of PADILLA, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

21. Finally, I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Given this, and in light of the fact that

7

PADILLA was involved with a prior smuggling event in a vehicle that he crossed into the United States from Mexico as early as October 1, 2018, I request permission to search the **Target Device** for items listed in Attachment B beginning on September 1, 2018, up to and including April 9, 2019.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device**

and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety days, absent further application to this court.

## CONCLUSION

25. Based on all of the facts and circumstances described above, there is probable cause to conclude that PADILLA used the **Target Device** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

26. Because the **Target Device** were promptly seized during the investigation of PADILLA's smuggling activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by PADILLA continues to exist on the **Target Device**. Additionally, although it is not known whether the **Target Device** was utilized by PADILLA during the November 2, 2018 U.S. Border Patrol stop, it was not seized at that time, and therefore there is probable cause to believe that evidence of illegal activities committed by PADILLA at that time continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from September 1, 2018, up to and including April 9, 2019.

//
//
//
//
//
//
//

27. WHEREFORE, I request that the court issue a warrant authorizing myself and/or other federal and state law enforcement officers to search the items described in Attachment A, and to seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Lauritz Austensen
HSI Special Agent

Subscribed and sworn to before me this 24th day of July, 2019.

Hon. XXXXXXXX Peter C. Lewis
United States Magistrate Judge